1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9  United States of America,              )    Nos. CV-11-2458-PHX-DGC (BSB)
                                          )         CR-07-411-PHX-DGC
10            Plaintiff/Respondent,        )
                                          )    **REPORT AND RECOMMENDATION**
11  vs.                                    )
                                          )
12  Uawndre Larue Fields,                  )
                                          )
13            Defendant/Movant.            )
                                          )
14  _____)

15          Defendant-Movant Uawndre Larue Fields (Defendant or Fields) has filed a pro se

16  Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody pursuant to

17  28 U.S.C § 2255. (Doc. 1.)  Defendant argues that his due process rights were violated because

18  the government did not exercise "more diligence" in locating a potential witness, Melanie

19  Martin (Martin), and did not offer this witness immunity in exchange for her testimony at

20  sentencing.  (Doc. 1.)[1]  The government has filed a response opposing Defendant's motion.

21  (Doc. 10.) Defendant has not replied and the deadline to do so has passed. For the reasons set

22  forth below, Defendant's motion should be denied.

23

24

25

26  _____

27        [1] Citations to "Doc." refer to the docket in CV-11-2458-PHX-DGC (BSB). Citations to
    "CR Doc." refer to the docket in CR-07-411-DGC.

28

1    **I.  Procedural and Factual History**

2           On August 14, 2007, a federal grand jury indicted Defendant Fields and two

3    co-defendants, Depaul Brooks (Brooks) and Julia Fonteneaux (Fonteneaux), on two counts each

4    of Sex Trafficking of a Minor, in violation of 18 U.S.C. § 1591(a), and two counts each of

5    Interstate Transportation of a Minor for Prostitution, in violation of 18 U.S.C. § 2423(a) and (e).

6    (CR Doc. 43.)  Defendant and Brooks were tried in a four-day jury trial that began on January

7    31, 2008 (CR Doc. 142), and Fonteneaux testified at trial pursuant to a cooperation agreement.

8    (Tr. 2/1/08 at 192-93.)[2]  The jury found Defendant and Brooks guilty on all counts.  (CR Doc.

9    149.)  On September 25, 2008, the Court sentenced Defendant to 198 months' imprisonment

10   on each count of conviction, to be served concurrently.  (CR Doc. 251.)

11          Defendant filed a timely notice of appeal and argued, in part, that the Court plainly

12   erred by failing to compel the government to grant Martin use immunity so that she could testify

13   at sentencing.  (CR Docs. 248, 253.)  The Ninth Circuit did not address this issue.  *See United*

14   *States v. Brooks,* 610 f.3d 1186, 1202 n.10 (9th Cir. 2010).  However, on an issue that co-

15   defendant Brooks raised, the Ninth Circuit found that the district court misinterpreted the scope

16   of U.S.S.G. § 2G1.3(b)(1) and vacated Defendant's sentence and remanded for resentencing.

17   On December 13, 2010, the Court sentenced Defendant to 180 months' imprisonment on each

18   count, to be served concurrently, and ten years' supervised release for each count, also to be

19   served concurrently.  (CR Doc. 304.)  On December 12, 2011, Defendant filed the pending

20   § 2255 motion.

21                  **A.  Evidence at Trial of Defendant's Offense Conduct**

22          At trial, the government presented the testimony of the juvenile victims, NK and RO,

23   and the cooperating witness, Fonteneaux, to establish the following facts supporting

24   Defendant's conviction. In April 2006, NK and RO, ran away from a residential treatment

25   center for juveniles in Scottsdale, Arizona. (Tr. 1/31/08 at 168-72; Tr. 2/1/08 at 43-46.)

26

27          [2] Citations to "Tr. 1/31/08" and "Tr. 2/1/08" are to the reporter's transcript, Doc. 250 and

28   Doc. 244, in CR-07-411-PHX-DGC.

1    The girls contacted a friend, "Chill," who picked them up and took them to a hotel

2   room he was renting in Mesa, Arizona.  After spending some time with the girls, Chill left them

3   alone in the hotel room where they stayed for a couple of days until the front desk told them to

4   leave. (Tr. 1/31/08 at 173-75; Tr. 2/1/08 at 47-49.)  The girls left the hotel and went to the store

5   to buy toiletries.  At the store, they encountered three men.  RO told the men that she and NK

6   had been left in a hotel room and had nowhere to go.  At trial, RO identified the men as

7   Defendant Fields, who she knew as "Big Face" or "Dre," a man known as "Lee," and

8   co-defendant Brooks, who she referred to as "goofy guy." (Tr. 2/1/08 at 49-51, 113-14.)  RO

9   and NK accompanied the men to a nearby motel, the "Rawl's Inn."  Fields left for the night, but

10  Brooks and Lee stayed at the hotel and talked to RO about "turning tricks" in San Diego.

11  (Tr. 2/1/08 at 51-54, 114-15.)

12    Defendant returned the next day and took RO for a ride in his car.  He told RO he was

13  a "pimp," and asked if she wanted to work for him in exchange for "money and a good life."

14  (Tr. 2/1/08 at 54-55.)  Defendant told RO he had other girls working for him, and that his "main

15  chick" was named "Sanae." (*Id.* at 57.)  Defendant introduced RO and NK to "Sanae" at the

16  Rawls Inn. "Sanae" was later identified as co-defendant Fonteneuax.[3] (Tr. 2/1/08 at 131, 192-

17  93.) RO had never engaged in prostitution, but was interested in the offer because she was afraid

18  she would get in trouble if she went home or back to the residential treatment center. (Tr. 2/1/08

19  at 54-58.)  RO later asked NK to go to San Diego with her to engage in prostitution and NK

20  agreed. (Tr. 2/1/2008 at 56.)

21    Defendant and Brooks took NK and RO to a Greyhound bus station where the girls

22  waited in the car while Defendant and Brooks bought them tickets to San Diego under false

23

24    [3] In April 2006, Fonteneaux was working as a prostitute in Arizona when Defendant
    introduced her to RO and NK at a hotel in Mesa. (Tr. 2/1/08 at 171, 173.) Fonteneaux testified

25  that she worked for Defendant as a prostitute for two-and-a-half years. Defendant did not have
    a "legitimate" job, and had other girls working for him as prostitutes at different times.

26  (Tr. 2/1/08 at 163-65, 167, 180, 190.) Fonteneaux knew Defendant as "Big Face," and "Dre"
    and had a tattoo with the name "Big Face" on her right shoulder.  She worked for Defendant in

27  several different cities during different times of year, but mainly worked in San Diego.

28  (Tr. 2/1/08 at 167-70.)

1  names. (Tr. 1/31/08 at 176-83; Tr. 2/1/08 at 63-65, 153-60.) Defendant and Brooks said they

2  would meet the girls in San Diego, and gave them a telephone number to call to arrange for

3  someone to pick them up at the bus station in San Diego. (Tr. 2/1/08 at 62-65.)

4  When the girls arrived in San Diego they called the number Defendant had given them

5  and Defendant's cousin, Tookie, picked them up and took them to her apartment for the night.

6  (*Id.* at 63-65.) The next morning, Defendant, Brooks and Fonteneaux arrived at the apartment.

7  (Tr. 2/1/08 at 65-66.) Defendant took RO to buy clothes and then picked up "Rene," another

8  one of his "girls." They all returned to Tookie's apartment, and then Defendant and Brooks

9  took RO and NK to a Howard Johnson's hotel. Fonteneaux went with them. She registered and

10  paid for the room, and stayed with the girls for two nights. (Tr. 2/1/08 at 67-71, 175-77.)

11  During that time, Fonteneaux posted prostitution ads on craigslist.com offering the

12  services of NK and RO. (Tr. 2/1/08 at 178-82, 222-23.) Because she did not have a camera,

13  Fonteneaux created the ads using photographs she found on the internet that resembled NK and

14  RO. (Tr. 1/31/08 at 192-95.) She also showed the girls her own internet prostitution ads, which

15  included her photograph, cell phone number, and pricing for her services. (Tr. 2/1/08 at 71-78,

16  258-63.) While staying at the Howard Johnson's hotel, RO engaged in two acts of prostitution

17  that resulted from the internet ads, and were arranged through phone calls to Fonteneaux's cell

18  phone. RO received $200 in exchange for her services with the first customer, and $160 for the

19  second. She gave all of the money to Fonteneaux, who called Defendant and reported that RO

20  had "turned tricks." (Tr. 2/1/08 at 78-82, 180, 182-84.)

21  Later, Fonteneaux, RO, and NK moved to a Best Value Inn where they stayed for one

22  night without engaging in prostitution. (*Id*. at 85-86.) The next day, Defendant and Brooks

23  arrived at the hotel in a maroon sedan and took RO and NK to Tookie's apartment. Defendant

24  later left in the maroon sedan and returned driving a dark-colored Ford Freestyle. Defendant,

25  Brooks, Fonteneaux, RO, NK, and Rene drove to Phoenix in the Ford Freestyle. (Tr. 1/31/08

26  at 198-201; Tr. 2/1/08 at 84-88, 184-87.)

27  When they arrived in Phoenix, Defendant left RO, Fonteneaux, and Rene near a

28  7-Eleven and a Circle K in an area where prostitutes appeared to be working. (Tr. 2/1/08 at

1   88-90.)  RO, Fonteneaux, and Rene each engaged in prostitution. (Tr. 2/1/08 at 189-90.)  RO

2   earned almost $300 and gave all but $30 to Fonteneaux.  (Tr. 2/1/08 at 89-90, 93-94.)  A police

3   officer stopped RO, Fonteneaux, and Rene near the Circle K.  RO gave a fake name, age, and

4   birth date.  (*Id*. at 94.) The officer detained RO because he thought she was lying, but released

5   Fonteneaux and Rene. (Tr. 2/1/08 at 94, 190.)  Fonteneaux called Defendant to let him know

6   that RO had been arrested.  (Tr. 2/1/08 at 189-90.)  The police officer took RO to the police

7   station, where she eventually told police her true identity and told them about her recent

8   activities.  (Tr. 2/1/08 at 94.)  RO later identified Defendant, Brooks, and Fonteneaux. (*Id*. at

9   96-101.)

10          After Fonteneaux, RO, and Rene were dropped off on a street corner, NK was taken

11  to a hotel where she slept until later that night.  At some point, Fonteneaux and Rene woke her

12  up to tell her that RO had been arrested.  (Tr. 1/31/08 at 203-04.)  NK went back to sleep.

13  When she woke up, Defendant picked her up, grabbed her clothes, and drove her to a

14  Greyhound bus station where he left her without a ticket or money.  (Tr. 1/31/08 at 203-05.)

15  NK eventually went home.  She was later interviewed by police and identified Brooks,

16  Defendant, and Fonteneaux.  (Tr. 1/31/08 at 205-15; Tr. 2/5/08 at 110-13.)[4]

17          **B.  The Sentencing Hearings**

18          At Defendant's September 8, 2008 sentencing hearing, defense counsel advised the

19  Court that Martin, whom she had never met and had previously been unable to locate, had

20  "appeared outside the courtroom" that morning.  (CR Doc. 236; Tr. 9/8/08 at 3-4.)[5]  Defense

21  counsel reported that Martin wanted to testify on Defendant's behalf, but because Martin had

22  "rented the car" that Defendant allegedly drove "to Phoenix with the two victims in the car,"

23  defense counsel moved to continue the sentencing hearing and requested that the Court appoint

24  counsel for Martin.  (Tr. 9/8/08 at 3-4, 6-7.)  The prosecutor advised the Court that the

25

26          [4] Citations to "Tr. 2/5/08" are to the reporter's transcript, Doc. 245 in CR-07-411-PHX-
       DGC.

27

28          [5] Citations to "Tr. 9/8/08" are to the reporter's transcript, Doc. 261 in
       CR-07-411-PHX-DGC.

1    government had also been unable to locate Martin and that she had not spoken with

2    investigators. The prosecutor agreed to the continuance and appointment of counsel. (Tr. 9/8/08

3    at 5-6.)

4           The Court appointed attorney Tyrone Mitchell to represent Martin. (*Id*. at 10.) After

5    consulting with the prosecutor, defense counsel, and Martin, Mitchell advised Martin "not to

6    say anything" until he obtained more information, and suggested that if the government granted

7    Martin immunity, it would "take care of this." (Tr. 9/8/08 at 11-13.) The Court continued the

8    sentencing hearing to September 25, 2008. (CR Doc. 236; Tr. 9/8/08 at 17.)

9           When the sentencing hearing resumed, Mitchell informed the Court that, because he

10   had been unable to reach an agreement with the government, he had advised Martin not to

11   appear, and she had followed his advice. (Tr. 9/25/08 at 4.)[6] Defense counsel requested an

12   opportunity to make a proffer regarding the testimony Martin would have given if the

13   government had granted her immunity. Defense counsel also requested that the Court consider

14   the proffer substantively for purposes of Defendant's sentencing objections. The proffer was

15   "based on [defense counsel's] brief interview with [Martin], [defense counsel's] conversation

16   with [Mr. Mitchell] after he spoke with [Ms. Martin], and . . . her ex-husband [White] . . . ."

17   (Tr. 9/25/08 at 5-6.) Counsel offered a lengthy proffer making the following points:

18          (1)   Martin had known Defendant for many years, her ex-husband White and

19   Defendant had known each other since childhood, and Defendant had even lived with Martin

20   and her ex-husband at various times;

21          (2)   in 2005, at a dinner that Martin hosted, Fonteneaux told Martin that she was a

22   prostitute;

23

24

25

26          [6] Citations to "Tr. 9/25/08" are to the reporter's transcript of the September 25, 2008
27   sentencing proceeding, Doc. 263 in CR-07-411-PHX-DGC.

28

1    (3) Martin was "well versed" in the prostitution/escort trade in San Diego, she had
2  an escort license, she had worked as an escort for many years, and she had occasionally referred
3  clients to Fonteneaux;

4    (4) Fonteneaux was well known on the streets of San Diego as an "independent
5  contractor" who did not have a pimp;

6    (5) Defendant was also well known on the streets of San Diego because of his past
7  gang affiliation, he had a reputation as a person who could get things done, and he knew
8  everyone in San Diego;

9    (6) according to Martin and White, prostitutes and escorts who were independent
10 contractors would often align themselves for protection and safety with someone who had a
11 gang affiliation or "street cred" and Martin thought that Fonteneaux was using Defendant for
12 his name;

13   (7) at one point, Fonteneaux "keyed" Defendant's car and let the air out of his tires
14 because she wanted a romantic relationship with Defendant and was upset that he did not want
15 a relationship with her;

16   (8) White and Defendant were together "all the time" and considered themselves
17 family, so if Defendant were a pimp White would have known it, and White was certain that
18 Defendant was not a pimp;

19   (9) According to White "sometimes people will look to another person for
20 protection," but Fonteneaux was running her own show and "anyone in the business in San
21 Diego knew that";

22   (10) Fonteneaux was in control, she recruited, and while she may have tried to align
23 herself with Defendant for protection, friendship, or love, she was an independent contractor
24 and Defendant was not running her business or coercing her or anyone who worked for her; and

25   (11) Defendant was "basically homeless a lot of the time" so it did not appear that he
26 was "raking in money" from Fonteneaux. (Tr. 9/25/08 at 8-14.)   Defense counsel explained
27 that she offered these points to refute the application of upward departures recommended in
28 paragraphs 30, 32, and 35 of the presentence report.

1    After considering additional arguments from defense counsel and the government

2 regarding the sentencing enhancements, the Court overruled Defendant's objections to

3 enhancements for care, custody, and control of the minors (paragraph 30), use of a computer

4 to offer or solicit prohibited sexual conduct with the minors (paragraph 32), and role in the

5 offense as an organizer or leader (paragraph 35). (Tr. 9/25/08 at 14-30.) The Court determined

6 that Defendant's offense level was 36, his criminal history category was IV, and his sentencing

7 guidelines range was 262 to 327 months' imprisonment. (Tr. 9/25/08 at 30.)

8    The Court then heard from a character witness, defense counsel, Defendant, and the

9 government. (Tr. 9/25/08 at 31-48.) Before discussing the 18 U.S.C. § 3553 sentencing factors,

10 the Court acknowledged defense counsel's proffer, but stated that it was "persuaded by the

11 evidence at the end of trial that the jury's verdict was correct" and "that the government had

12 proved all four counts beyond a reasonable doubt on the basis of the evidence that was

13 presented here. Not just from Ms. Fonteneaux but from several different witnesses and from

14 other sources, including circumstantial evidence, videotapes, hotel records, computer records."

15 (Tr. 9/25/08 at 48-49.)

16    The Court "accept[ed] the fact that [Defendant had] contributed substantially to the

17 youth in San Diego through [his] community efforts and through [his] coaching, and that he had

18 a difficult childhood." (Tr. 9/25/08 at 49-51.) The Court also noted that Defendant's criminal

19 history category of IV overstated the seriousness of his criminal history. The Court exercised

20 its discretion and imposed a sentence of 198 months' imprisonment, "64 months lower than the

21 bottom end of the guideline range," for each count of conviction, all counts to run concurrently.

22 (Tr. 9/25/08 at 51-52.) On December 13, 2010, after the Ninth Circuit vacated Defendant's

23 sentence, the district court sentenced Defendant to 180 months' imprisonment on each count

24 of conviction, to run concurrently, followed by ten years' supervised release on each count of

25 conviction, also to run concurrently. (CR Doc. 304; Tr. 12/13/2010 at 13-15.)[7]

26

27

28    [7]   Citations to "Tr. 12/12/2010" are to the reporter's transcript, Doc. 312 in CR-07-411-PHX-DGC.

1    **II.  Analysis**

2         In his § 2255 motion, Defendant argues that the government violated his due process

3    rights by failing to locate Martin and then by failing to offer her immunity in exchange for her

4    testimony at sentencing. As a result of these violations, he argues that he received a longer

5    sentence because he claims that Martin's testimony would have negated two of his sentencing

6    enhancements. As set forth below, Defendant's arguments fail and should be rejected.[8]

7         **A.  Standard of Review**

8         Title 28 U.S.C. § 2255 provides that a person in custody may challenge the

9    Constitutionality and legality of his sentence and the court's jurisdiction to impose the

10   challenged sentence:

11              A prisoner in custody under sentence of a court established by Act of
               Congress claiming the right to be released upon the ground that the sentence
12              was imposed in violation of the Constitution or laws of the United States,
               or that the court was without jurisdiction to impose such sentence, or that
13              the sentence was in excess of the maximum authorized by law, or is
               otherwise subject to collateral attack, may move the court which imposed
14              the sentence to vacate, set aside or correct the sentence.

15   *Id.* Thus, to prevail, Defendant must demonstrate that his sentence was imposed in violation

16   of the United States Constitution or federal law.  A court that receives a motion filed under

17   § 2255 "must grant a hearing to determine the validity of a petition brought under that section,

18   '[u]nless the motions and files and records of the case conclusively show that the petitioner is

19   entitled to no relief.'"  *United States v. Blaylock*, 20 F.3d 1458, 1465 (9th Cir. 1994) (quoting

20   28 U.S.C. § 2255).  Here, because the record conclusively shows that Defendant is not entitled

21   to relief, the Court need not hold an evidentiary hearing.  *See id.*

22        **B.  Failure to Locate a Witness**

23        Defendant first argues that he was denied due process because the government "did

24   not show more diligence in attempting to locate [Martin]."  (Doc. 1 at 4.)  This is the entirety

25

26        [8] In its response, the government discusses two other issues that Defendant raised on
27   direct appeal, but that he does not assert in his § 2255 motion. (Doc. 10 at 2.)  The Court will
     only address the issues raised in the § 2255 motion.
28

1  of Defendant's argument pertaining to the government's alleged lack of effort to locate Martin.

2  Defendant's unsupported, conclusory allegations are insufficient to support his claim for relief

3  under § 2255.  *See United States v. McMullen*, 98 F.3d 1155, 1158 (9th Cir. 1996) (noting that

4  conclusory allegations, unsupported by specific facts, do not support a claim for relief under §

5  2255); *see also Shah v. United States*, 878 F.2d 1156, 1161 (9th Cir. 1989) (vague or conclusory

6  allegations warrant summary dismissal of § 2255 claims).

7  **C.  Due Process Violation/Compelled Immunity**

8  Defendant also asserts a due process claim based on the failure of the government to

9  offer, or the Court to compel, use immunity to Martin at sentencing.  As an initial matter, "[a]

10 defendant has no absolute right to elicit testimony from any witness . . . whom he may desire."

11 *United States v. Carman,* 577 F.2d 556, 561 (9th Cir. 1978).  In certain "exceptional cases,"

12 however, the court can compel the government to offer a witness use immunity.  *United States*

13 *v. Straub*, 538 F.3d 1147, 1156 (9th Cir. 2008).  Specifically, "a district court can compel a

14 defense witness's immunity absent a finding of prosecutorial misconduct, where 'in exceptional

15 cases, the fact-finding process may be so distorted through the prosecution's decisions to grant

16 immunity to its own witness while denying immunity to a witness with directly contradictory

17 testimony that the defendant's due process right to a fair trial is violated.'"  *United States v.*

18 *Wilkes*, 662 F.3d 524, 533 (9th Cir. 2011) (emphasis in original) (quoting *Straub*, 538 F.3d at

19 1166).

20 Under this test, the defendant must show that the testimony is relevant and that the

21 government intentionally distorted the fact-finding process. Defendant must show:

22
23
24
25
26
> (1) the defense witness's testimony was relevant; and (2) either (a) the prosecution intentionally caused the defense witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process; or (b) the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness, with the effect of so distorting the fact-finding process that the defendant was denied his due process right to a fundamentally fair trial.

27
28

- 10 -

1    *Straub*, 538 F.3d at 1162.  Under the first part of this test, the "relevancy requirement is

2    minimal." *Id.* at 1163.  Defendant is not required to show that the proffered testimony is

3    "clearly exculpatory or essential to the defense." *Id*.

4            The government argues that Defendant's claim fails because, although the Ninth

5    Circuit has held that due process may require a district court to compel use immunity during

6    trial, it has not extended this holding to sentencing.  As the government notes, the relevant

7    Ninth Circuit case law involves trial, not sentencing.  *See Straub*, 538 F.3d 1147 (finding that

8    refusal to grant use immunity to defendant's witness at trial denied defendant his due process

9    right to a fair trial); *Williams v. Woodford*, 384 F.3d 567, 601-02 (9th Cir. 2004) (finding that

10   prosecution did not improperly cause witnesses to invoke their Fifth Amendment privilege at

11   trial); *United States v. Westerdahl*, 945 F.2d 1083, 1086-87 (9th Cir. 1991) (remanding for

12   evidentiary hearing to determine whether "government intentionally distorted the fact-finding

13   process" by failing to grant immunity to a defense witness at trial).

14           Defendant does not argue that Martin should have been granted immunity to testify

15   at trial.  The government argues that the due process concerns that are present when a defense

16   witness is denied immunity at trial are not present during sentencing and, therefore, it is not

17   error for the court to fail to compel the government to offer immunity to a witness to testify at

18   sentencing.  The Court need not resolve this issue because even assuming that the law regarding

19   compelled use immunity extends to sentencing,  Defendant fails to establish a due process

20   violation based on the failure to grant use immunity to Martin.

21           Here, Martin's proffered testimony pertained to Defendant's reputation in the San

22   Diego community, his relationship with Fonteneaux, and cumulative testimony about

23   Fonteneaux's profession and her business practices. (Tr. 9/25/08 at 8-14.) In addition, although

24   not part of the proffer, defense counsel stated that Martin had rented the vehicle in which the

25   minors were transported from San Diego to Phoenix and therefore sought separate counsel for

26   Martin.  (Tr. 9/25/08 at 8-14.)  Aside from information about the rental car, the proffer of

27   Martin's expected testimony did not pertain to the specific events giving rise to the charges

28   against Defendant.  However, because the relevancy requirement for compelled use immunity

1 is "minimal," the Court will assume that Martin's testimony could have been relevant to

2 impeach Fonteneaux's testimony and thus could have been relevant to the upward departures

3 recommended in the presentence report.

4       Nonetheless, even if Martin's testimony could have been relevant, Defendant cannot

5 not satisfy the either prong of the second part of the compelled use immunity test.  First, there

6 is no evidence that the government "intentionally caused [Martin] to invoke the Fifth

7 Amendment right against self-incrimination with the purpose of distorting the fact-finding

8 process." *Straub*, 538 F.3d at 1162.  To satisfy this requirement, Defendant must show that the

9 government's actions were "akin to prosecutorial misconduct." *Id.* at 1157-58.  The Ninth

10 Circuit has found that intimidating or harassing a witness "by threatening the witness with

11 prosecution for perjury or other offenses" may constitute such misconduct. *See Williams*, 384

12 F.3d at 601-02.  "The prosecution's conduct must amount to a substantial interference with the

13 defense witness's free and unhampered determination to testify before the conduct violates the

14 defendant's right to due process." *Id.* at 602. (citations omitted).

15       Here, although Defendant argues that the government failed to offer Martin immunity,

16 there is no indication that the government had any contact with Martin or otherwise interfered

17 with her decision not to testify at sentencing.  Rather, at Defendant's scheduled sentencing,

18 defense counsel spoke with Martin and advised the Court that she might benefit from the

19 appointment of counsel.  The Court appointed counsel for Martin, and her counsel subsequently

20 advised her not to testify or appear at the resumed sentencing hearing. (Tr. 9/8/08 at 4.)  There

21 is no evidence that the government engaged in conduct that was "akin to prosecutorial

22 misconduct." *See Straub*, 538 F.3d at 1157-58.

23       Second, Defendant also fails to establish that Martin's testimony would "have

24 supported a finding that the testimony directly contradicted that of the government's witness."

25 *Straub,* 538 F.3d at 1163.  As previously noted, other than testimony that Martin rented the car

26 that Defendant drove from San Diego to Phoenix, Martin's proffered testimony did not involve

27 the specific events giving rise to the charges.  Additionally, Defendant has not identified the

28

1  testimony of any immunized government witness that Martin's testimony would have directly

2  contradicted.

3        Because Defendant has not shown that the government's actions caused Martin to

4  invoke the Fifth Amendment or that Martin's testimony would have directly contradicted the

5  testimony of an immunized government witness, the Court need not consider whether the failure

6  to compel the government to grant Martin immunity distorted the fact-finding process. *See*

7  *Straub*, 538 F.3d at 1159-60.  Because Defendant has not satisfied the *Straub* test, the district

8  court did not violate Defendant's right to due process by failing to compel the government to

9  grant Martin immunity.

10  **III.  Conclusion**

11        Based on the foregoing, Defendant is not entitled to relief and his § 2255 motion

12  should be denied.

13        Accordingly,

14        **IT IS RECOMMENDED** that Defendant's Motion to Vacate, Set Aside, or Correct

15  Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255 (Doc. 1) be **DENIED**.

16        **IT IS FURTHER RECOMMENDED** that a certificate of appealability and leave

17  to proceed in forma pauperis on appeal be denied because Defendant has not made a substantial

18  showing of the denial of a constitutional right.

19        This recommendation is not an order that is immediately appealable to the Ninth

20  Circuit Court of Appeals. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not

21  be filed until entry of the District Court's judgment.  The parties shall have fourteen days from

22  the date of service of a copy of this recommendation within which to file specific written

23  objections with the Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6, 72.  Thereafter, the

24  parties have fourteen days within which to file a response to the objections.  Failure to file

25  timely objections to the Magistrate Judge's Report and Recommendation may result in the

26  acceptance of the Report and Recommendation by the District Court without further review.

27  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure to file timely

28  objections to any factual determinations of the Magistrate Judge may be considered a waiver

1   of a party's right to appellate review of the findings of fact in an order or judgment entered

2   pursuant to the Magistrate Judge's recommendation.  *See* Fed. R. Civ. P. 72.

3          DATED this 19th day of October, 2012.

4

5

6                                                   Bridget S. Bade

7                                          United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28